[762 NYS2d 335]

In the Matter of LAWRENCE M. FURTZAIG, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, April 15, 2003

**APPEARANCES OF COUNSEL**

*Mady J. Edelstein* of counsel (*Thomas J. Cahill,* attorney), for petitioner.

*Michael S. Ross* for respondent.

**OPINION OF THE COURT**

Per Curiam.

Respondent Lawrence M. Furtzaig was admitted to the

practice of law in the State of New York by the First Judicial Department on January 13, 1986, and, at all times pertinent to this proceeding, has maintained an office for the practice of law within the First Judicial Department.

On May 23, 2002, the Departmental Disciplinary Committee for the First Department (the Committee) served respondent with a notice and statement of charges containing 13 charges. The various charges alleged that respondent engaged in dishonesty regarding several matters involving five clients of his law firm, Rosenberg & Estis, P.C., and his fabrication of three false court orders and a bond, constituting conduct involving fraud, dishonesty, misrepresentation and deceit in violation of Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3). The charges also alleged that respondent neglected several matters by failing to litigate them as promised in violation of DR 6-101 (a) (3) (22 NYCRR 1200.30). Charge 13 alleged that by engaging in all of the charged conduct, respondent engaged in conduct that adversely reflects on his fitness to practice law in violation of DR 1-102 (a) (7). Charge 7, which alleged that respondent engaged in dishonest conduct toward the court, was withdrawn by stipulation.

On June 18, 2002, respondent answered the charges, essentially admitting the conduct but denying that it violated the code. On July 30, 2002, the parties entered into a prehearing stipulation whereby respondent admitted to the remaining 12 charges. On July 31, 2002, the Referee sustained the admitted 12 charges and conducted a sanction hearing at which respondent testified on his own behalf and offered testimony from his treating psychologist, Dr. Neal Cohen. At the end of the hearing, the Committee recommended disbarment, and respondent requested a suspension. By report and recommendation dated September 27, 2002, the Referee recommended a five-year suspension.

On October 29, 2002, a Hearing Panel heard argument. The Committee urged the Hearing Panel to confirm the Referee's findings, but to recommended disbarment. By report dated November 12, 2002, four out of five members recommended disbarment. The fifth panel member dissented, agreeing with the Referee's recommendation.

The Committee now seeks an order confirming the Hearing Panel's findings of fact and conclusions of law, and confirming the Panel's recommendation of disbarment. Respondent cross-moves seeking an order confirming the Referee's report, disaffirming the Hearing Panel's report, and imposing a five-year suspension.

The charges arose out of six separate matters involving five clients commencing around 1990 and continuing until 2000. Respondent's deceit involved numerous, sometimes elaborate falsehoods to his clients regarding the status of their cases including three instances where he forged court orders and forged a bond to perpetuate the deception. However, none of respondent's conduct involved the commingling or misappropriation of funds. In fact, in one instance, where respondent had falsely told a client that he had recovered rent arrears from the client's tenants, respondent paid the arrears—$60,000—out of his own pocket to cover up his inaction.

In recommending suspension, the Referee considered several mitigating factors. Respondent, who was 44 years old at the time of the hearing and the father of six-year-old triplets, is the sole source of income for his family. In addition, respondent's father had abandoned his family when respondent was in his early teens. Respondent put himself through college working as a mechanic while still making Phi Beta Kappa. He met Warren Estis, a senior partner at Rosenberg & Estis, shortly after he graduated from college and was hired as a paralegal. He then went to New York Law school at night and became close to Mr. Estis. Respondent became an associate in the firm in 1985, a nonequity partner in 1990 (the time period when his misconduct began), and one of five equity partners in June 2000. Respondent was assigned to work on most of the complex cases in the firm and had base billings of 2,200 to 2,400 hours per year. Despite his close relationship with Mr. Estis, little, if any, senior support or help was available on difficult matters and the work environment was extremely pressured with little tolerance for failure, resulting in high turnover of legal personnel.

The Referee noted that respondent sounded both contrite and remorseful when he testified and that in each matter he was aware he was doing something wrong. Respondent testified that the pressure to succeed was overwhelming and he felt paralyzed, unable to tell the firm that he was not able to keep up with the assigned work or to ask for help. Although respondent's developing pattern of avoidance spread to other cases, the Referee noted that it affected only a small percentage of his work over a ten-year period, i.e., about two percent. At the time that Estis finally confronted respondent, respondent was severely suicidal. Following discovery of his misconduct, respondent began psychological counseling and taking antidepressant medications. Respondent has maintained a minimal

law practice of about five clients which he operates out of the basement of his home.

Dr. Cohen, who respondent started seeing after his misconduct had been discovered, testified that it was his belief that respondent's ongoing wrongful conduct was rooted in a deep seated fear of failure and severe depression which affected both his personal and professional life. At their first meeting in November 2000, Dr. Cohen diagnosed respondent as suffering from "major depression" and "suicidal thoughts" and showing signs of "profound guilt." In further mitigation, respondent's counsel argued that although respondent's misconduct was intentional, it was causally related to his depression.

While we confirm the Hearing Panel's findings of fact and conclusions of law, we disagree with its recommended sanction. Rather, based on these particular facts and circumstances, we agree with the Referee's recommendation that a five-year suspension is the appropriate penalty. In doing so, we recognize the critical distinction between those prior cases in which a censure or suspension is imposed on first-time offenders or offenders with minor disciplinary records in "neglect" cases (*see, e.g., Matter of Kantor*, 241 AD2d 103 [1998], *lv denied* 92 NY2d 813 [1998] [three prior admonishments]; *Matter of Nadler*, 229 AD2d 175 [2d Dept 1997] [no prior disciplinary record]; *Matter of Siegel*, 193 AD2d 181 [1993] [three prior admonishments]; *see also Matter of Roman-Perez*, 195 AD2d 192 [2d Dept 1994], *lv denied* 83 NY2d 756 [1994] [no prior disciplinary record]) and those cases in which disbarment was imposed where misappropriation or conversion of client funds was also involved (*Matter of Gibbons*, 294 AD2d 53 [2002]; *Matter of Perrini*, 232 AD2d 138 [1997]) or where forgeries were made for personal financial gain (*Matter of Feldman*, 252 AD2d 76 [1998]).

The Referee's recommended penalty of a five-year suspension is well supported by, and consistent with case law. For example, in *Matter of Kantor* (241 AD2d 103 [1998]), respondent, who had been admonished on three separate prior occasions, failed to seek the lawful objectives of his client, made material misrepresentations to his client, created false court documents in an elaborate scheme to convince his client that the action was proceeding, and failed to file federal and state tax returns for three years. Despite mitigating psychological evidence, we imposed a sanction of a suspension of five years. In *Matter of Nadler* (229 AD2d 175 [1997]), respondent, with no prior disciplinary history, fabricated a settlement stip-

ulation and a court decision. A five-year suspension was found to be appropriate despite medical testimony offered in mitigation.

Thus, even if we were to reject respondent's mitigating medical evidence, as urged by the Committee, we nevertheless would find that a five-year suspension is an appropriate sanction (*see Matter of Siegel, supra* [this Court did not find attorney's debilitating episodes of depression a mitigating factor in imposing three-year suspension for 14 acts of misconduct including multiple acts of client neglect, failure to distribute client settlement funds for 13 years and inaccurately advising client of case status]; *contrast Matter of Solymosy*, 252 AD2d 152 [1999] [this Court rejected hearing panel's recommendation of disbarment and instead imposed a four-year suspension where the attorney presented psychiatric evidence that he suffered from depression at the time of most of his transgressions]).

While it is true that respondent's deception occurred over a ten-year period and involved the neglect of a number of client matters, the falsification of court orders and a bond to cover-up the neglect, and misrepresentation of the status of those cases to his clients and his partners, his misconduct affected a small percentage of his cases and, as the Panel's dissenting member concluded, it was not as egregious as the conduct in cases cited by the Panel to support disbarment. Indeed, most cases where this Court has disbarred attorneys involved misconduct that included conversion of client funds or other aggravating factors, neither of which are present here (*see Matter of Gadye*, 283 AD2d 1 [2001]). Indeed, it is undisputed that in one instance respondent used $60,000 of his own money to pay his client a sum the client would have been entitled to receive had respondent properly handled the client's case.

We believe the Referee properly concluded that there was sufficient evidence in mitigation against disbarment regardless of a causal link between respondent's depression and misconduct. These other mitigating factors include respondent's unblemished disciplinary record, his full cooperation, his acceptance of his responsibility for his wrongdoing and his true remorse, and his family situation in that he is the sole breadwinner for his wife and six-year-old triplets. Finally, a lengthy suspension of five years protects the public interest and sends a significant message to the bar that this misconduct will not be tolerated and it carries serious consequences.

Accordingly, the Committee's motion should be granted to the extent of confirming the Hearing Panel's findings of fact

and conclusions of law and the recommended sanction of disbarment disaffirmed, respondent's cross-motion should be granted to the extent of imposing a five-year suspension, and respondent suspended from the practice of law in the State of New York for a period of five years and until further order of this Court.

BUCKLEY, P.J., NARDELLI, TOM, FRIEDMAN and MARLOW, JJ., concur.

Petition granted to the extent of confirming the Hearing Panel's findings of fact and conclusions of law and disaffirming the recommended sanction, as indicated. Cross motion granted to the extent of suspending respondent from the practice of law for a period of five years, effective May 15, 2003, and until further order of this Court, as indicated.